# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
### Richard P. Matsch, Senior District Judge

Civil Action No. 13-cv-02406-RPM

DAVID MILLARD,
EUGENE KNIGHT,
ARTURO VEGA,

      Plaintiffs,

v.

MICHAEL RANKIN, in his official capacity as Director of the Colorado Bureau of
Investigation,

      Defendant.

_____

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
### ORDER FOR ENTRY OF JUDGMENT

_____

      Plaintiffs are registered sex offenders under the Colorado Sex Offender Registration Act ("SORA"), C.R.S. §§ 16-22-101, *et seq.* In this civil action brought pursuant to 42 U.S.C. § 1983 they seek declaratory and injunctive relief, claiming that continuing enforcement of the requirements of SORA against them violates their rights under the Eighth and Fourteenth Amendments to the United States Constitution. Defendant is the Director of the Colorado Bureau of Investigation ("CBI"), the state agency responsible for maintaining the centralized registry of sex offenders and providing information on a state web site.

      After consideration of the evidence submitted at trial and the written arguments of counsel the Court now enters the following findings of fact, conclusions of law, and order.

<u>**The Colorado Sex Offender Registration Act**</u>

*Registration Requirements*

SORA requires a person convicted of unlawful sexual behavior or another offense, the underlying factual basis of which involves unlawful sexual behavior, to register with the state as a sex offender. C.R.S. § 16-22-103. SORA defines unlawful sexual behavior to include a wide range of offenses, and its registration requirements apply to both adult and juvenile offenders. *See City of Northglenn v. Ibarra*, 62 P.3d 151, 156-57 (Colo. 2003); *see also* C.R.S. § 16-22-102(3) (defining "conviction") and § 16-22-102(9) (defining "unlawful sexual behavior").

*The Registration Process*

A person required to register must register with the local law enforcement agency in each jurisdiction in which the person resides. C.R.S. § 16-22-108(1)(a)(I). Registration is required to be done in person at the person's local law enforcement agency by completing a standardized registration form and paying any registration fee imposed by the local law enforcement agency. C.R.S. § 16-22-108(7).

All persons required to register must reregister at least annually and any time they change addresses or names; certain specified offenders are required to reregister quarterly. C.R.S. § 16-22-108(1)(b), (c), and (d).[1] A person required to register who has been convicted of a "child sex crime" is further required to register "all e-mail addresses, instant-messaging identities, or chat room identities prior to using the address or identity," as well as any changes of such addresses or identities. C.R.S. § 16-22-108(2.5)(a) and (3)(g). "Child sex crime" encompasses many offenses; as relevant here, it includes sexual assault on a child as provided in C.R.S. § 18-3-405,

_____

[1] Persons required to reregister on a quarterly basis include, among others, those guilty of certain felony sexual assaults and sexual assault on a child. C.R.S. § 16-22-108(d)(II).

as well as "criminal attempt, conspiracy, or solicitation to commit any of the specified acts." C.R.S. § 16-22-108(c).

Failure to comply with the registration requirements is a criminal offense. C.R.S. § 18-3-412.5.

A standardized form prescribed by the CBI is used for registration. C.R.S. § 16-22-109. By statute, information required by the form includes (but is not limited to) the registrant's name (including all legal names and aliases used), date of birth, address, and place of employment; and all e-mail addresses, instant-messaging identities, and chat room identities to be used by the person if the person is required to register that information pursuant to section 16-22-108(2.5) (persons convicted of "child sex crimes"). C.R.S. § 16-22-109(1).

### *The Sex Offender Registry and CBI's Authority to Release Registry Information*

The CBI serves as official custodian of all registration forms and other documents associated with sex offender registration. It is required to maintain a statewide central registry—known as the sex offender registry—of persons required to register under SORA. C.R.S. § 16-22-110(1). The registry is required to provide certain information, at a minimum, to all criminal justice agencies with regard to all registered persons. C.R.S. § 16-22-110(2).

The CBI is also authorized to provide to members of the public, upon request and payment of any fees assessed for search, retrieval, and copying, "the name, address or addresses, and aliases of the registrant; the registrant's date of birth; a photograph of the registrant, if requested and readily available; and the conviction resulting in the registrant being required to register pursuant to this article." C.R.S. § 16-22-110(6)(f). The CBI may inform someone requesting a criminal history check whether the person being checked is on the sex offender

registry; members of the public may also request a list of all persons on the registry. C.R.S. § 16-22-110(b) and (c).

With respect to the public availability of such information, SORA states:

The general assembly hereby recognizes the need to balance the expectations of persons convicted of offenses involving unlawful sexual behavior and the public's need to adequately protect themselves and their children from these persons, as expressed in section 16-22-112(1). The general assembly declares, however, that, in making information concerning persons convicted of offenses involving unlawful sexual behavior available to the public, it is not the general assembly's intent that the information be used to inflict retribution or additional punishment on any person convicted of unlawful sexual behavior or of another offense, the underlying factual basis of which involves unlawful sexual behavior.

C.R.S. § 16-22-110(6).

### *The CBI's Internet Posting of Sex Offender Information*

SORA also requires the CBI to post on the State of Colorado's internet homepage a link to "a list containing the names, addresses, and physical descriptions of certain persons and descriptions of the offenses committed by said persons." C.R.S. § 16-22-111(1). The "certain persons" whose information must be posted on the State's website include persons convicted of being sexually violent predators; persons convicted as an adult of two or more felony offenses involving unlawful sexual behavior; persons convicted of a crime of violence as defined in section C.R.S. § 18-1.3-406; and persons required to register because they were convicted of a felony as an adult, but who fail to register as required.[2]

For such persons, the physical description posted on the State's website "shall include, but need not be limited to, the person's sex, height, and weight, any identifying characteristics of

_____

[2] Juvenile offenders do not appear on the website, even if they are later convicted of failure to register. However, juvenile offenders do appear on the list of registered sex offenders that members of the public may obtain from the CBI on request, as discussed above.

the person, and a digitized photograph or image of the person." C.R.S. § 16-22-111(1).

Section 16-22-111(1.5) further provides:

> In addition to the posting required by subsection (1) of this section, the CBI may post a link on the state of Colorado homepage on the internet to a list, including but not limited to the names, addresses, and physical descriptions of any person required to register pursuant to section 16-22-103, as a result of a conviction for a felony. A person's physical description shall include, but need not be limited to, the person's sex, height, weight, and any other identifying characteristics of the person.

> Pursuant to C.R.S. § 16-22-111(2)(a), the CBI has authority to determine whether a

person has failed to register as required, and if so, to post information concerning that person on

the State's internet site. In addition, if a local law enforcement agency files criminal charges

against a person for failure to register as a sex offender, that agency is required to notify the CBI,

which is required to post the information concerning the person on the internet. C.R.S. § 16-22-

111(2)(b).

### *Local Law Enforcement Agencies' Publication of Sex Offender Information*

SORA also authorizes local law enforcement agencies to post on their websites certain

information about registered sex offenders, if the offender falls within one of the categories

described in § 16-22-112(2)(b). SORA disclaims any legislative intent to impose punishment

through the public release of such information:

> The general assembly finds that persons convicted of offenses involving unlawful sexual behavior have a reduced expectation of privacy because of the public's interest in public safety. The general assembly further finds that the public must have access to information concerning persons convicted of offenses involving unlawful sexual behavior that is collected pursuant to this article to allow them to adequately protect themselves and their children from these persons. The general assembly declares, however, that, in making this information available to the public, as provided in this section and section 16-22-110(6), it is not the general assembly's intent that the information be used to inflict retribution or additional

punishment on any person convicted of unlawful sexual behavior or of another offense, the underlying factual basis of which involves unlawful sexual behavior.

C.R.S. § 16-22-112(1).

### *The Process for Removal of Information from the Registry and/or Internet*

SORA allows some but not all registrants to petition for removal from the registry and/or have the CBI remove their information from the State's internet site. C.R.S. § 16-22-113. Certain persons required to register may file a petition with the court that issued the judgment for the conviction that required registration to discontinue that requirement or internet posting, or both. Such a petition may be filed after a period of five, ten, or twenty years after discharge from incarceration or other completion of all sentencing requirements; the length of the applicable period depends on the statutory classification of the sex offense for which the registrant was convicted. C.R.S. § 16-22-113(1)(a)–(c). Persons convicted of certain offenses are subject to SORA's registration requirements for the rest of their lives. C.R.S. § 16-22-113(3).[3]

As to juveniles, SORA provides procedures for a person to petition to discontinue the duty to register, to have the CBI discontinue posting on the internet, and also to be removed from the sex offender registry itself:

(e) Except as otherwise provided in subparagraph (II) of paragraph (b) of subsection (1.3) of this section, if the person was younger than eighteen years of age at the time of commission of the offense, **after the successful completion of and discharge from a juvenile sentence or disposition**, and if the person prior to such time has not been subsequently convicted or has a pending prosecution for unlawful sexual behavior or for

---

[3] Persons subject to the lifetime registration requirement include, among others, those convicted of being a sexually violent predator; those convicted as adults of sexual assault on a child, sexual assault on a client by a psychotherapist, incest; and adults convicted of multiple sex offenses. *Id.*

any other offense, the underlying factual basis of which involved unlawful sexual behavior and the court did not issue an order either continuing the duty to register or discontinuing the duty to register pursuant to paragraph (b) of subsection (1.3) of this section. Any person petitioning pursuant to this paragraph (e) may also petition for an order removing his or her name from the sex offender registry. **In determining whether to grant the order, the court shall consider whether the person is likely to commit a subsequent offense of or involving unlawful sexual behavior**. The court shall base its determination on recommendations from the person's probation or community parole officer, the person's treatment provider, and the prosecuting attorney for the jurisdiction in which the person was tried and on the recommendations included in the person's presentence investigation report. In addition, the court shall consider any written or oral testimony submitted by the victim of the offense for which the petitioner was required to register….

C.R.S. § 16-22-113(1)(e) (emphasis added).

## Plaintiffs' Sex Offense Adjudications, Registration Requirements, and Evidence of Harm

### David Millard

David Millard pleaded guilty to second degree sex assault on a minor in 1999, resulting in a sentence of 90 days jail work release and eight years probation. His plea agreement required him to register as a sex offender for ten years after completing probation. While on probation, he successfully completed sex offense specific treatment. His probation was never revoked or extended, and he completed his period of probation in October 2007. Since beginning his probation he has not been accused of committing any type of crime or engaging in any type of inappropriate sexual conduct. He is eligible to petition to be removed from the sex offender registry in October 2017.

Mr. Millard has registered as required since his conviction, and has never been charged with failure to register. Registration forms provided to him by his local law enforcement agency for the past two years have required—and he has provided—disclosure of his email addresses. Because Mr. Millard was convicted of a felony sex offense as an adult, his information appears

on the list of registered sex offenders that members of the public may obtain from the CBI on request; and that information as well as a photograph are on the CBI website.

Mr. Millard has worked for Albertsons for 14 years, since 2003. He disclosed on his employment application that he had a felony conviction and said that he would "explain in person," but he was not asked about his answer at that time and Albertsons did not do a background check. Because a requirement of his probation was to disclose his offense to his employer, he told his boss he was convicted in 1999 of second degree sexual assault. His boss did not ask for more details, but a condition of continued employment was that there be no problems and that no one find out about the conviction.

As a result, Mr. Millard has lived in fear of discovery and losing his job. That fear increased in approximately 2005, when according to Mr. Millard's testimony the publication of his sex offender status began to include a photograph, making his identity more accessible through the internet. He was not permitted to access the internet during his probationary period. After completing probation he Googled his name and was shocked to discover that multiple websites—both publicly-run and private, commercial sites—displayed his information, including his picture, the offense for which he was convicted, his address, and a description of body scars as further identification. One website had incorrect information about him that he was able to have removed, but only after approximately six months. The availability and extent of the public information caused Mr. Millard to live in fear of discovery, loss of his job, and retaliation through harm to himself or his family.

In 2015, a customer discovered Mr. Millard on a sex offender website and reported the discovery to Albertsons' human relations department, resulting in an internal investigation. A

fellow employee spread the information to other employees in the store. As a result, Mr. Millard was transferred to another store where the information had not become known. He has been specifically advised by his employer that he will lose his job if the information about him being a registered sex offender becomes known at the new store. Thus, even though his employer has been supportive, discovery by a customer or fellow employee is a constant concern for him given the ready availability of the information on the internet.

Mr. Millard has been forced to change residences. Shortly after his conviction, a representative of the Arapahoe County Sheriff's Department came to his apartment complex and informed the leasing office that Mr. Millard was a registered sex offender. He was not permitted to renew his lease and was required to move.

He was not asked about his background or sex offender status before he applied to move into his next apartment. In 2005, Channel 7, a Denver television station, ran an "investigative report" on a news program that filmed leasing agents saying no felons were tenants at certain apartment complexes, but admitting that they did not do background checks on rental applications. The reporter then identified felons who were living in the complex. The program placed a primary emphasis on sex offenders. Mr. Millard learned of the Channel 7 program when a fellow tenant asked him if he knew there were a lot of sex offenders at the complex, and told him about the Channel 7 program. Mr. Millard watched the Channel 7 News report and saw his name come on the screen among a list of sex offenders living at the complex. Shortly after the Channel 7 story aired, a letter was posted on his door requiring him to move from the complex within thirty days.

Mr. Millard moved into his mother's home, where he lived for several years. During that

period he filled out some 200 or more rental applications, without success. He finally found another apartment, which he obtained after fully disclosing and explaining his background and conviction.

Mr. Millard ultimately was able to purchase the house where he now lives. But he remains subject to periodic visits by Denver Police officers to confirm the accuracy of his registered address. If he is not home when they visit, they leave prominent, brightly-colored "registered sex offender" tags on his front door notifying him that he must contact the DPD.

On one occasion a DPD officer hung a tag on his door even though Mr. Millard had spoken with the officer by telephone and explained he was at work and would not be home at the time of the visit. Mr. Millard was so concerned about the risk of discovery that he asked for time off work to go home to remove the tag, which displeased his boss. In following up from that incident, two DPD officers came to his house, banged noisily on the door, and loudly told Mr. Millard, in front of and in earshot of watching neighbors, that they were there to do a sex offender home check. Mr. Millard's previously-cordial neighbors have since avoided him and become less friendly.

Mr. Millard's experiences from public awareness that he is a registered sex offender have left him in fear of retribution. On one occasion he walked out of his mother's house and two persons walking by remarked "there's that f-ing sex offender." His car was "keyed" and burglarized. Because of the fear and anxiety about his safety in public Mr. Millard does little more than go to work, isolating himself at his home.

### Eugene Knight

Eugene Knight was charged with two counts of sexual assault on a child in 2006, based

on conduct occurring in September 2005 when he was eighteen years old. A plea bargain resulted in his conviction for attempted sexual assault on a child. He was sentenced to eight years supervised probation and a 90-day jail sentence. The conditions of his probation sentence required him to participate in offense-specific treatment at a contractor-owned sex offender treatment entity called Sexual Offender Resource Services. The treatment prescribed for him included requiring him to

undergo periodic polygraphs and other tests[4] as determined by his therapist. Because he could not afford to pay the costs of these tests, his probation was revoked and he was sentenced to two years imprisonment, including presentence confinement time. He was paroled in November 2009 and discharged from parole in April or May 2011. Mr. Knight's parole was never revoked. He is not eligible to petition to be removed from the sex offender registry until 2021.

Since his 2006 conviction, Mr. Knight has not been accused of any other sex offense or sexually inappropriate conduct. The only crime of which he has been accused since 2006 was a 2013 charge for failure to register as a sex offender. The charge was mistaken and was ultimately dismissed, but only after he endured the indignity, inconvenience, expense, and anxiety of being arrested, having to post bond, and making two court appearances over some two months.

Because Mr. Knight was convicted of a felony sex offense as an adult, his information appears on the list of registered sex offenders that members of the public may obtain from the CBI on request; and that information as well as a photograph are on the CBI website. Mr. Knight's information on the CBI's website and sex offender registry states that he was convicted of "sexual assault on a child" in violation of C.R.S. § 18-3-405, even though his conviction was for attempted sexual assault on a child. That error from the CBI website has been carried over to

---

[4] Mr. Knight testified that the polygraphs, which cost $250 to $300 per test, were required approximately quarterly, and that additional expenses included group and individual therapy sessions and a line of other tests that—purportedly—monitor and measure a man's sexual deviancy level. One such required test was the penile plethysmograph, which has been found to be so "exceptionally intrusive in nature and duration" as to implicate substantive due process concerns when imposed as a requirement of employment or supervised release. *See, e.g., U.S. v. Weber*, 451 F.3d 552, 562-69 (9th Cir. 2006). One judge opined that "the Orwellian procedure [is] always a violation of the personal dignity of which prisoners are not deprived." *Id.* at 570 (Noonan, J., concurring). Mr. Knight never underwent a plethysmograph and the validity of that requirement is not at issue in this case. That it was part of his required "treatment" nevertheless exemplifies the extent to which sex offenders are subject to extreme invasions of their personal liberty and privacy.

at least one privately-operated website.

Mr. Knight describes his family role as "full-time father." He has two children, who were in kindergarten and third grade at the time of this trial. He testified that he does not work outside the home because he has had difficulty finding a job that pays enough to offset the costs of child care. One job application, at Home Depot, was rejected because, he was told, a background check came back "red-flagged." He does not know whether this rejection was because of his sex offender status or because of other matters on his record. Because the mother of his children is employed full time, Mr. Knight cares for the children during the day and takes them to and from school.

In September 2014 Mr. Knight received a letter from the principal of his children's school informing him that she and Denver Public Schools (DPS) had become aware of his status as a registered sex offender, and that he "is in violation of Denver Public Schools Board of Education Policy KFA, which prohibits, among other things, disruption of teaching or administrative operations, and the creation of an unsafe/threatening environment for our students and staff members." The letter stated that effective immediately, and for the duration of the 2014-15 school year, Mr. Knight was barred from entering the grounds of his children's school and all other DPS schools and facilities. It informed him that for daily drop-off and pick-up he would be required to remain on the sidewalk outside the school, and the children would be accompanied to and from the school building by a paraprofessional. It also stated that if Mr. Knight failed to follow these directives, DPS security and/or the Denver Police Department would be asked to intervene. DPS sent similar letters to Mr. Knight for the 2015-16 and 2016-17 school years.

This exclusion from his children's school is solely because he is a registered sex offender. Neither DPS nor anyone else has ever accused Mr. Knight of any conduct allegedly disrupting school operations or creating an unsafe or threatening school environment. Other than one occasion, Mr. Knight has not been inside his children's school since receiving this letter. The arrangement allowed by the school has proven inconvenient and on numerous occasions the school has not lived up to its obligations to escort his children to him, resulting in ongoing difficulties for Mr. Knight and his children. The bar has also interfered with his ability to attend school events, and has caused concerns and confusion for his children about why he cannot go into their school building like other parents.

### Arturo Vega

At age 15, Arturo Vega was adjudicated a juvenile offender for conduct occurring when he was 13 years old. He pleaded guilty to third degree sexual assault and was sentenced to probation with the condition that he reside in a juvenile treatment facility. He did not understand the sex offender registration requirements.

Mr. Vega's probation was revoked and he was sentenced to serve two years at the Division of Youth Corrections at Lookout Mountain where he was required to participate in sex offender treatment. He testified without contradiction—and therefore it is undisputed—that he did attend and complete treatment as required, including sex offender treatment and anger management classes. His sentence was not extended or modified because of any claimed failure to attend or complete treatment. Mr. Vega was released from Lookout Mountain in May or June 2000, and was on parole for approximately a year. He also attended required therapy while on parole.

Mr. Vega was convicted of a misdemeanor for failure to register in September 2001, for which he was fined, and he did then register as a juvenile sex offender. Because he was adjudicated a sex offender as a juvenile, he does not appear on the CBI website, but his registration information—including his name, address, and physical description including scars, marks and tattoos—is on the list of sex offenders that the public can obtain from the CBI. Although a criminal background check does not show Mr. Vega's underlying juvenile adjudication, his presence on the sex offender registry—for failure to register as a sex offender—does.

Mr. Vega has experienced employment difficulties. He has maintained employment with a furniture installation contractor, but during that employment he has been asked to leave and/or prevented from being able to work at certain government and other facilities that require background checks. There is no evidence establishing that any of these employment difficulties were specifically as a result of Mr. Vega's conviction for failure to register as a sex offender, rather than other charges that would also appear in a more general background check of Mr. Vega's record.[5]

Mr. Vega made two attempts to be removed from the sex offender registry by submitting petitions to the sentencing court pursuant to C.R.S. § 16-22-113(1)(e), set forth above. A statutory condition is the successful completion of and discharge from a juvenile sentence. *Id.* These petitions to the Jefferson County District Court in 2006 and 2012 were heard and denied by magistrates. He did not appeal.

SORA provides two conditions for granting a juvenile offender's petition: (1) "successful

---

[5] A background check for Mr. Vega would also show alcohol-related driving charges, assault and threat, disturbing the peace, and damaged property.

completion and discharge from a juvenile sentence or disposition" and (2) that he "has not been subsequently convicted or has a pending prosecution for unlawful sexual behavior or any other offense, the underlying factual basis of which involved unlawful sexual behavior." C.R.S. § 16-22-113(1)(e). It further states that "[i]n determining whether to grant the order, the court shall consider whether the person is **likely to commit** a subsequent offense of or involving unlawful sexual behavior…." C.R.S. § 16-22-113(1)(e) (emphasis added). The statute does not explicitly assign or define a burden of proof, nor does it establish a standard for the court to apply in determining whether to grant a petition to deregister. The Colorado Court of Appeals has observed that "the statute appears to leave to the discretion of the trial court the ultimate decision of whether to grant a petition requesting discontinuation of sex offender registration, as well as the factors to consider in making that decision." *People v. Carbajal*, 312 P.3d 1183, 1190 (Colo. App. 2012).

At the hearings on both of Mr. Vega's petitions in 2006 and 2012, it was not disputed that he had successfully completed his juvenile sentence and had been discharged from confinement at the Department of Youth Corrections and from his subsequent period of parole. It was also undisputed that Vega had committed no additional sex offenses.

In applying the statutory requirement that the court consider "whether the person is **likely to commit** a subsequent offense of or involving unlawful sexual behavior," the respective magistrates put the burden on Mr. Vega to prove, by a preponderance of the evidence, a negative: that he was **not likely** to commit such an offense. *See, e.g.,* Ex. L at 824:17-24 (magistrate stating that she did "not believe, based on your testimony today, that you have learned enough from your treatment that I can find even by a preponderance of the evidence that

you would be, at this point in time, unlikely to commit a subsequent offense….").

Both magistrates held that Mr. Vega had failed to submit specific information that is not required by statute and, in Mr. Vega's case, was—and always will be—impossible for him to provide. That is, both magistrates required proof not only of the statutory requirement that Mr. Vega had successfully completed his "sentence or disposition" (which was not in dispute) but also that he had "successfully" completed a program of sex offender treatment while serving his sentence. Mr. Vega testified at both hearings that he had completed such treatment. No contrary evidence was presented to either magistrate. Despite this undisputed testimony, both magistrates expressed skepticism about whether he had really completed treatment and whether it had been "successful" based on an undefined standard applied by the magistrate. *See, e.g., id.* at 0824:5-6.

In the June 2012 hearing, the magistrate made proof of successful completion of treatment a **condition** of the petition being granted, **in addition** to requiring Mr. Vega to prove he was not likely to commit another sex offense: "[Y]ou're going to have to show in some form or fashion, not only that you're not going to reoffend but that you successfully completed treatment and your sentence." Ex. M at 0911:7-9. In December 2012, the same magistrate again appeared to make proof of successful treatment an absolute condition of deregistration, even though that is not in the statute. Ex. N at 0964:3-4 ("[W]ithout being able to make that finding, I do not believe I can grant the petition for removal from registry."). The magistrate was informed that Mr. Vega's record at Lookout Mountain has been destroyed in conformity with a standard practice. She suggested that if Mr. Vega were to enroll in and successfully complete another course of offense specific treatment, that would likely change the outcome. *Id.* at 966:3-7. This at least implicitly added an additional term to Mr. Vega's sentence or disposition, even though

the evidence was undisputed that he had already completed it.

## Non-Party Witnesses

At trial, Plaintiffs presented testimony from non-party witnesses concerning their experiences resulting from their or an acquaintance's appearance on the sex offender registry. This evidence was not rebutted. Such evidence of the actual adverse consequences of sex offender registration requirements is relevant to Plaintiffs' Eighth Amendment claim and the determination whether SORA's actual effects, as distinguished from its stated intent, are punitive. It also corroborates Plaintiffs' expressed fears and concerns about the potential consequences they face from public reaction to them as registered sex offenders.

It suffices to say, without recounting the details of their testimony here,[6] that these witnesses established that registered sex offenders and their families and friends face a known, real, and serious threat of retaliation, violence, ostracism, shaming, and other unfair and irrational treatment from the public, directly resulting from their status as registered sex offenders, and regardless of any threat to public safety based on an objective determination of their specific offenses, circumstances, and personal attributes.

## Analysis

Plaintiffs do not argue that SORA is facially invalid, but rather assert that SORA's sex offender registration requirements, as applied to them, violate the Eighth Amendment's proscription against cruel and unusual punishment and the Fourteenth Amendment's requirements of procedural and substantive due process. *See United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) ("An as-applied challenge concedes that the statute may be

---

[6] Some of these witnesses' experiences are summarized below.

constitutional in many of its applications, but contends that it is not so under the particular circumstances of the case").

## I. Eighth Amendment

### A. Punishment

Analysis of Plaintiffs' Eighth Amendment claim first requires the Court to determine whether SORA's sex offender registration requirements are "punishment" within the meaning of the prohibition of cruel and unusual punishments in the Eighth Amendment. Case law considering this issue has arisen almost entirely in the context of challenges to the retroactive application of sex offender registration requirements under federal or state prohibitions against ex post facto laws.

In *Smith v. Doe,* 538 U.S. 84 (2003), the Supreme Court employed an "intent-effects" analytical framework to determine whether Alaska's sex offender registration statute was punitive. The Court stated that it would first consider whether the legislative intent was to impose punishment; if so, "that ends the inquiry." *Id.* at 92. If the intent was to enact a statutory scheme that is civil and non-punitive, however, the Court stated that it must further examine whether the statutory scheme is so punitive in purpose or effect as to negate the legislative intention to deem it "civil." *Id.* In making the "effects" analysis, the Court considered five of the seven factors employed in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963):

> The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: [1] has been regarded in our history and traditions as a punishment; [2] imposes an affirmative disability or restraint; [3] promotes the traditional aims of punishment; [4] has a rational connection to a nonpunitive purpose; or [5] is excessive with respect to this purpose.

*Smith v. Doe*, 538 U.S. at 97. The two additional factors considered in *Kennedy* were [6] whether

the statute's requirements come into play only on a finding of scienter; and [7] whether the behavior to which it applies is already a crime. *Kennedy*, 372 U.S. at 168-69. The *Smith* Court held that the effects of the Alaska version of SORA were non-punitive, and therefore retroactive application of the law did not violate the Ex Post Facto Clause of the United States Constitution.

In the Ninth Circuit opinion that preceded *Smith v. Doe*, *Doe I v. Otte,* 259 F.3d 979 (9th Cir. 2001), holding the Alaska statute punitive **in effect**, the court included the following paragraph:

> Not only do the Alaska statute's registration provisions impose an affirmative disability, but its notification provisions do so as well. By posting the appellants' names, addresses, and employer addresses on the internet, the Act subjects them to community obloquy and scorn that damage them personally and professionally. For example, the record contains evidence that one sex offender subject to the Alaska statute suffered community hostility and {"pageset":"S9cc2} damage to his business after printouts from the Alaska sex offender registration internet website were publicly distributed and posted on bulletin boards.

*Id.* at 987-88.

> In reversing in *Smith v. Doe,* Justice Kennedy for the majority wrote:

> ... These facts do not render Internet notification punitive. The purpose and the principal effect of notification are to inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation.

> The State's Web site does not provide the public with means to shame the offender by, say, posting comments underneath his record. An individual seeking the information must take the initial step of going to the Department of Public Safety's Web site, proceed to the sex offender registry, and then look up the desired information. The process is more analogous to a visit to an official archive of criminal records than it is to a scheme forcing an offender to appear in public with some visible badge of past criminality. The Internet makes the document search more efficient, cost effective, and convenient for Alaska's citizenry.

*Smith v. Doe*, 538 U.S. at 99. The Court also stated, in distinguishing the requirement of *Kansas v. Hendricks,* 521 U.S. 346 (1997), for an individual assessment of dangerousness, that in the

context of the Alaska sex offender statute the state could "dispense with individual predictions of future dangerousness and allow the public to assess the risk" based on the information provided about registrants' convictions. *Smith v. Doe*, 538 U.S. at 104.

In her dissent, Justice Ginsburg wrote:

... And meriting heaviest weight in my judgment, the Act makes no provision whatever for the possibility of rehabilitation: Offenders cannot shorten their registration or notification period, even on the clearest demonstration of rehabilitation or conclusive proof of physical incapacitation. However plain it may be that a former sex offender currently poses no threat of recidivism, he will remain subject to long-term monitoring and inescapable humiliation.

*Id.* at 117 (footnote omitted). Citing to the respondents' brief she observed that John Doe I had completed a treatment program, had subsequently remarried, established a business and had been granted custody of a minor daughter on a court's determination that he had been successfully rehabilitated. *Id.* at 117. The case was decided in the district court on motions for summary judgment and apart from Justice Ginsburg's reference there is no explanation of what may have been evidentiary support for the parties' respective arguments.

Applying the same analytical framework to other states' laws or under state constitutional provisions, a number of courts have reached a conclusion different from the Supreme Court's in *Smith v. Doe*. The Alaska Supreme Court, considering the same statute before the Supreme Court in *Smith v. Doe*, held that the act was so punitive in purpose or effect as to overcome the legislature's civil intent, and therefore violated the Alaska Constitution. *Doe v. State*, 189 P.3d 999 (2008). *See also, e.g., Does v. Snyder,* 834 F.3d 696 (6th Cir. 2016) (Michigan's sex offender registration act retroactively imposed punishment and therefore violated Ex Post Facto Clause of United States Constitution); *State v. Letalien*, 985 A.2d 4 (Me. 2009) (retroactive application of Maine registration statute violated both Maine and United

States Constitutions' Ex Post Facto Clauses); *Doe v. State,* 111 A.3d 1077 (N.H. 2015) (effects of New Hampshire sex offender registration provisions were punitive; retroactive application violated New Hampshire Constitution); *Starkey v. Okla. Dept. of Corrections*, 305 P.3d 1004 (Okla. 2013) (Oklahoma sex offender registration statute was punitive; retroactive application of its provisions violated the Oklahoma Constitution).[7]

Defendants assert that SORA has been "determined in Colorado" to be non-punitive, citing *U.S. v. Davis*, 352 Fed. App'x 270 (10th Cir. 2009) (unpublished). But *Davis*, a non-binding unpublished decision involving a case arising in Oklahoma, considered the federal Sex Offender Registration and Notification Act, 18 U.S.C. § 2250. *Id.* at 271-72. And although panels of the Colorado Court of Appeals have declined to find SORA's provisions to be punitive, those cases have not engaged in the "intent-effects" analysis used by the United States Supreme Court, and the Colorado Supreme Court has not addressed the question. *See, e.g., People in the Interest of J.O.*, 383 P.3d 69, 73-74 (Colo. App. 2015) (discussing non-punitive purpose of registration requirements, with no discussion of effects); *People v. Carbajal*, 312 P.3d at 1189 (same). Therefore the issue has not been "determined in Colorado."

In *Shaw v. Patton,* 823 F.3d 556 (10th Cir. 2016), the court had an evidentiary record from a bench trial on the claim that application of the Oklahoma statute to the plaintiff who moved from Texas where he had been convicted of a sex offense was in violation of the Ex Post Facto clause. The appellate panel determined that there was no violation because it was not

---

[7] The Court recognizes that the decisions of these courts and others involved statutes that had varying provisions not identical with Colorado's SORA. Michigan's SORA, for example, considered in *Does v. Snyder*, included residency restrictions not appearing in Colorado's SORA. These courts' analysis of the relevant factors is nevertheless persuasive authority in analyzing whether SORA is punitive.

retroactive punishment. Only two provisions of the statute were considered: (1) the requirements for reporting, and (2) the restrictions on residency and loitering within 2,000 or 500 feet, respectively, of a school, playground, park or child care center. *Id.*, 823 F.3d at 559.

The plaintiff made an as-applied-to-him challenge so the court only considered those requirements as they affected him. *Id.* at 560-61. The appellate court's review of the district court's application of the intent-effects test was *de novo*. *Id.* The opinion was that these reporting and residency requirements did not sufficiently resemble banishment and probation. *Id.* at 563-65. It was different from probation in that there was no active supervision and mere reporting did not include other common requirements of probationary sentence. *Id.*

The court discussed banishment at some length, citing to a number of treatises describing banishment as it has been used historically. *Id.* at 566-68. The appellate judges viewed banishment as complete expulsion from a community, normally a geographical area. Shaw was only prohibited from residing in those areas within the geographical limits but he was free to enter the same areas. The court did not address loitering, holding that the argument had been forfeited by failing to present it to the district court. *Id.* at 577.

The *Shaw* opinion was narrowly drawn based on an evidentiary record. There were 26 endnotes. In note 11 the court rejected the contention that Shaw was being "shamed" by the disclosure of personal information on the internet by relying on Justice Kennedy's statement in *Smith. Id.* at 563 n.11. In the last note, the court said that because this was an as-applied challenge the court's conclusion is limited to Mr. Shaw's circumstances. *Id.* at 577 n.26.

Applying the analysis called for by the Supreme Court, this Court first concludes that the **intent** of SORA is non-punitive. Plaintiffs do not dispute the legislative statements of intent in

C.R.S. §§ 16-22-110(6) and 16-22-112(1).[8]

Weighing the factors considered in *Smith v. Doe* leads to the conclusion that SORA's **effects** on these Plaintiffs are plainly punitive, negating the legislative intent.

Justice Kennedy's words ring hollow that the state's website does not provide the public with means to shame the offender when considering the evidence in this case. He and his colleagues did not foresee the development of private, commercial websites exploiting the information made available to them and the opportunities for "investigative journalism" as that done by a Denver television station adversely affecting Eugene Knight. The justices did not foresee the ubiquitous influence of social media.

The Colorado General Assembly's disavowal of any punitive intent is an avoidance of any responsibility for the results of warning the public of the dangers to be expected from registered sex offenders. The register is telling the public— DANGER – STAY AWAY. How is the public to react to this warning? What is expected to be the means by which people are to protect themselves and their children?

As shown by the experience of these plaintiffs and the experience of others who have testified, the effect of publication of the information required to be provided by registration is to expose the registrants to punishments inflicted not by the state but by their fellow citizens.

The fear that pervades the public reaction to sex offenses—particularly as to children—generates reactions that are cruel and in disregard of any objective assessment of the

---

[8] As the Court has noted previously, the Colorado General Assembly implicitly recognized that registration is punitive to at least some degree: SORA permits courts to exempt a person who was younger than eighteen years of age at the time of the commission of the offense from the registration requirements if it determines that registration "would be <u>unfairly</u> punitive." C.R.S. § 16-22-103(5)(a) (emphasis added). The use of "unfairly" suggests that at least some level of punishment is intended—just not an "unfair" level. The Court cannot conclude, however, that this reference overcomes the expressly-stated non-punitive intent.

individual's actual proclivity to commit new sex offenses. The failure to make any individual assessment is a fundamental flaw in the system.

In setting out the factors to be considered in determining whether a sanction is penal or regulatory in nature, in *Kennedy v. Mendoza*-Martinez, Justice Goldberg noted that banishment was a weapon in the English legal arsenal for centuries, but that "it was always 'adjudged a harsh punishment even by men who were accustomed to brutality in the administration of criminal justice.'" *Kennedy v. Mendoza-Martinez*, 372 U.S. at 168 n.23 (citing 4 Blackstone's Commentaries *377 and quoting Maxey, Loss of Nationality: Individual Choice or Government Flat [*sic*–Fiat]?, 26 Albany L. Rev. 151, 164 (1962)).

Public shaming and banishment are forms of punishment that may be considered cruel and unusual under the Eighth Amendment. *See Smith v. Doe*, 538 U.S. at 109 (Souter, J., concurring). Other courts considering this factor have found that sex offender registry statutes are sufficiently analogous to shaming to warrant a finding that this factor weighs in favor of finding a punitive effect. *See, e.g., Does v. Snyder,* 834 F.3d at 701-03; *Doe v. State,* 189 P.3d at 1012; *Doe v. State*, 111 A.3d at 1097; *see also Smith*, 538 U.S. at 116 (Ginsburg, J., dissenting). Further, as the Sixth Circuit observed, a sex offender registration act that requires regular reporting to law enforcement in person, for which failure to comply is a crime punishable by imprisonment, also resembles the punishment characteristics of parole or probation. *Does v. Snyder*, 834 F.3d at 703.

The observations of these other courts apply here. The record in this case reflects that maintaining the sex offender registry, requiring internet publication of information on the registry, and permitting republication of the information by private websites have effects that are

analogous to the historical punishment of shaming and further resemble and threaten to result in effective banishment. All three Plaintiffs have experienced these effects in varying degrees. Mr. Millard's experiences are particularly illustrative, where he has suffered the indignity of being unable to find housing despite hundreds of applications, has been forced to move because of a TV news story focusing on sex offenders in apartment housing, and, after finally managing to purchase his own home, has continued to suffer the indignity of loud public visits from the police and placement of bright markers on his door announcing his sex offender status to the neighborhood.

Other evidence shows that these experiences are not isolated or unusual and that Plaintiffs' experiences, fears, and anxieties are not exaggerated or imagined. One witness called by Plaintiffs, Richard Gillit, is an Englewood City Councilman. He testified about Englewood's efforts to enact and enforce municipal "distancing" requirements which, by prohibiting registered sex offenders from residing within a certain distance from schools, parks, and daycare centers, effectively bar registered sex offenders from living in most of the city. *See Ryals v. City of Englewood,* 364 P.3d 900 (Colo. 2016) (holding that Englewood's ordinance, which was estimated to make 99% of the city off-limits to qualifying sex offenders, is not preempted by state law). *See also id.*, 364 P.3d at 914-15 (Hood, J., concurring in part and dissenting in part; discussing the domino effect of upholding such local laws, giving "the remaining metro-area cities … every incentive to pass residency bans in order to prevent sex offenders from moving into their communities"). Mr. Gillit also testified about his own incorrect public reference to one registered sex offender as a "sexually violent predator" based on information he saw on a private website. This evidenced the random vulnerability of registered sex offenders to false

26

accusations, innuendo, and public humiliation based on either mistaken or intentional spreading of information and, given normal human foibles, misinformation.

Another witness—not a registered sex offender herself—testified that she was subjected to harassment and shunning from her neighbors, in the form of letters, emails, personal visits, and Facebook posts, after she agreed to allow a registered sex offender to reside in her home. The pressure was so intense that it ultimately led her to sell her house and move, even though her acquaintance had moved out. A third witness, a teacher at a parochial school, testified to pressure she received from her employer—a Roman Catholic archdiocese—after a parent recognized and reported her as the **spouse** of a registered sex offender. Her husband had never been to the school, much less accused of any threatening conduct. Officials of the archdiocese, when meeting with this witness, questioned whether she should continue teaching there, and even questioned whether she should remain married to her husband. All of these witnesses further demonstrated the significant and ubiquitous consequences faced by registered sex offenders and their families and associates.

This Court also agrees with the Sixth Circuit's observations concerning SORA's resemblance to parole or probation in its requirements of frequent in-person reporting, enforced by potential criminal punishment. *See Does v. Snyder*, 834 F.3d at 703.

In addition, in Colorado certain offenders are required to disclose and register "all e-mail addresses, instant-messaging identities, or chat room identities prior to using the address or identity," as well as any changes of such addresses or identities. C.R.S. § 16-22-108(2.5)(a) and (3)(g). This furthers the ability of state and local authorities to monitor private aspects of a registered sex offender's life and, consequently, chills his or her ability to communicate freely.

Mr. Millard has been subjected to this requirement, even though there is no evidence that the crime for which he was convicted involved the use of the internet or social media, or that there is any objective danger of his doing so.

This is a significant incursion: the Supreme Court has recognized First Amendment protection of internet communications because cyberspace—the "vast democratic forums of the Internet"—and social media in particular, are "the most important places … for the exchange of views…." *Packingham v. North Carolina*, __ U.S. __, 137 S.Ct. 1730, 1735 (2017) (quoting *Reno v. American Civil Liberties Union*, 521 U.S. 844, 868 (1997)). While *Packingham* involved a First Amendment challenge and this case does not, Justice Kennedy writing for the majority noted parenthetically that "the troubling fact that the law imposes **severe restrictions on persons who already have served their sentence and are no longer subject to the supervision of the criminal justice system** is … not an issue before the Court." *Id.*, 137 S.Ct. at 1737 (emphasis added). That observation is significant here.

SORA's registration requirement does not sweep as broadly in prohibiting the **use** of the internet and social media as the law struck down in *Packingham*, but it does something the North Carolina law did not. By requiring certain offenders to register email addresses and other internet identities, SORA provides law enforcement a supervisory tool to keep an eye out for registered sex offenders using email and social media. That is one more restrictive and intrusive provision that resembles the supervisory aspects of parole and probation, and complements and continues the state's comprehensive supervision of registered sex offenders even after they are released from the express provisions of their parole or probation. That aspect of SORA is a "severe restriction" like the provisions in *Packingham*. It also distinguishes SORA from the Alaska law

considered in *Smith v. Doe*, in which the Court concluded that the registration provisions were not similar to probation because they did not call for ongoing supervision.[9]

These similarities to historical forms of punishment weigh in favor of finding that SORA's effects are punitive.

SORA also imposes affirmative disabilities or restraints that are greater than those deemed "minor and indirect" by the Supreme Court in *Smith*. There, the Court expressly noted that the law under consideration did not have an in-person reporting requirement, and further stated that the record contained "no evidence that the Act has led to substantial occupational or housing disadvantages for former sex offenders that would not have otherwise occurred." *Smith,* 538 U.S. at 100.

Here, Plaintiffs are subject to in-person reporting requirements for as long as they remain on the registry, and Mr. Vega's experience demonstrates that even the theoretical ability to petition to deregister can be illusory. Having to report to law enforcement every time one moves,

---

[9] *Packingham* also reflects an apparent evolution in the mindset of Justice Kennedy, who authored the majority opinions in both *Smith v. Doe* and *Packingham*. In *Smith*, decided in 2003, Justice Kennedy downplayed the punitive effect of statutory internet notification provisions, finding their "purpose and the principal effect" were "to inform the public for its own safety, not to humiliate the offender"; and that the internet simply makes a public records search "more efficient, cost effective, and convenient" for citizens. *Smith*, 538 U.S. at 99. In 2017, in addition to noting that restrictions on internet use are a "severe restriction," Justice Kennedy recognized that the internet and social media websites "can provide perhaps the most powerful mechanisms available to a private citizen to make his or her voice heard." *Packingham*, 137 S.Ct. at 1737. That being the case, the power provided by the internet works both ways: not only to provide citizens a convenient and inexpensive means to identify and locate convicted sex offenders, but also to provide a citizen the means, if so inclined, to quickly and efficiently disseminate information about a sex offender to other members of the public with the intent to harass or humiliate. The record in this case casts serious doubt on Justice Kennedy's conclusions in *Smith* that the "principal effect" of putting sex offender data on the internet is merely informational, and not humiliation.

as well as at regular time intervals, is hardly a "minor or indirect" restraint, especially when failure to do so is punishable as a crime and also may subject the registrant to in-person home visits and public humiliation by over-zealous, malicious, or at least insensitive law enforcement personnel. The evidence in this case demonstrates that the very real restraints on Plaintiffs' abilities to live, work, accompany their children to school, and otherwise freely live their lives are not simply a result of the crimes they committed, but of their placement on the registry and publication of their status.

This factor weighs in favor of finding that SORA's effects are punitive. *See also Does v. Snyder*, 534 F.3d at 703-04; *Doe v. State*, 111 A.3d at 1094-95; *State v. Letalien*, 985 A.2d at 18; *Starkey*, 305 P.3d at 1022.

Another factor is whether SORA promotes traditional aims of punishment—"retribution and deterrence." *Mendoza-Martinez*, 372 U.S. at 168. SORA avows public safety as its purpose, disclaiming any intent to inflict "retribution or additional punishment." C.R.S. § 16-22-112(1). Defendant Rankin, however, acknowledged at trial as Director of the CBI that the registry has multiple purposes: to enhance public safety, to provide an investigative tool for law enforcement, and "there's also a deterrent effect of having the information available…." Trial Trans., 11/14/2016 at 10:7–8. He elaborated that this deterrent effect of the registry is both his own opinion and the official policy position of the CBI, and that the potential for deterrence applies to potential first-time offenders as well as potential re-offenders. *Id.* at 15:15–17:6. The CBI website also states that the registry's goals are "Citizen/Public Safety; Deterrence of sex offenders for committing similar crimes; and Investigative tool for law enforcement." CBI Sex Offender Registry website, "Goals of the Sex Offender Registry"; viewable at:

https://apps.colorado.gov/apps/dps/sor/information.jsf (accessed August 30, 2017). It is thus undisputed that the registry promotes deterrence, a traditional aim of punishment.

In addition, SORA requires offenders to register based only on their conviction for a past action, and based on a statutory classification of the offense and not on an individualized assessment of an offender's level of dangerousness. Such a scheme "begins to look far more like retribution for past offenses" than a public safety regulation. *Doe v. State*, 111 A.3d at 1094 (quoting *Com. v. Baker*, 295 S.W.2d 437, 444 (Ky. 2009)). It therefore "strains credulity to suppose that the Act's deterrent effect is not substantial, or that the Act does not promote community condemnation of the offender, both of which are included in the traditional aims of punishment." *Id.* (quoting *Wallace v. State*, 905 N.E.2d 371, 382 (Ind. 2009)).

This factor weighs in favor of finding that SORA's effects are punitive.

Courts considering whether there is a rational connection to a non-punitive purpose have uniformly determined that there is at least some rational connection between sex offender registration requirements similar to Colorado's and the avowed regulatory purpose of public safety. *See, e.g., Doe v. State*, 111 A.3d at 1099-1100; *Wallace*, 905 N.E.2d at 382-83. Plaintiffs here do not argue the contrary. This factor weighs against finding a punitive effect.

The Court is also to consider whether the registration scheme imposed by SORA "appears excessive in relation to the alternative purpose assigned," *Mendoza-Martinez*, 372 U.S. at 169; that is, "whether the regulatory means chosen are reasonable in light of the nonpunitive objective." *Smith*, 538 U.S. at 105.

Colorado's law imposes quarterly or annual registration requirements, for five, ten, or twenty years before a petition to deregister may be filed, or for life with no chance to deregister.

These requirements are based on the statutory level of the offense for which a person is convicted. No consideration is given, before these requirements are imposed or at any time before deregistration is permitted, to an individual's relative level of risk to the community. There is no opportunity for an individual to shorten the length of his registration period or reduce the frequency of these requirements even if he is able to submit convincing evidence that he is completely rehabilitated and poses no danger to public safety. Likewise, the information made available to the public is based on the level of statutory offense for which one is convicted, again without any determination of a specific individual's potential risk. Similarly, SORA's requirements for disclosure and registration of internet identities are based solely on statutory classifications of an offender's conviction, and are not tied to past abuse of the internet.

These sweeping registration and disclosure requirements—in the name of public safety but not linked to a finding that public safety is at risk in a particular case—are excessive in relation to SORA's expressed public safety objective. *See Doe v. State,* 111 A.3d at 1100 ("If in fact there is no meaningful risk to the public, then the imposition of such requirements becomes wholly punitive."); *see also Wallace,* 905 N.E.2d at 383-84; *Smith v. Doe*, 538 U.S. at 117 (Ginsburg, J., dissenting).

Consideration of SORA's application to Plaintiffs' particular experiences, as summarized above, demonstrates this point. Application of unalterable registration requirements and time periods with no possibility of considering their individual circumstances is arbitrary and excessive.

This factor favors treating SORA as punitive.

If a sanction is not linked to a showing of scienter, it is less likely to be intended as a

punishment. *Wallace*, 905 N.E.2d at 381. SORA's registration requirements apply to a variety of offenses, but most require a finding that the offender acted "knowingly." *See, e.g.,* C.R.S. §§ 18-3-402, -404, -405. Although not a significant factor, it weighs in favor of finding that SORA is punitive.

SORA also imposes its registration requirements for behavior that is already a crime. As Justice Souter stated in *Smith*,

> The fact that the Act uses past crime as the touchstone, probably sweeping in a significant number of people who pose no real threat to the community, serves to feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones.

*Smith*, 538 U.S. at 109 (Souter, J., concurring). Other courts have considered this factor and found it indicates a punitive effect. *See Doe v. State*, 189 P.3d at 1015; *Wallace*, 905 N.E.2d at 382; *Letalien*, 985 A.2d at 22; *Doe v. State*, 111 A.3d at 1099; *Starkey*, 305 P.3d at 1028. This Court agrees.

In summary, all but one of the seven factors weighs in favor of a conclusion that SORA's effects are punitive. These punitive effects are sufficient to overcome the stated regulatory, non-punitive intent of the Act.

## B. Cruel and Unusual

Most cruel and unusual punishment cases—those not involving what is deemed to be an "inherently barbaric" punishment such as torture—consider whether a punishment is disproportionate to the crime. This approach is based on the "precept of justice that punishment for crime should be graduated and proportioned to [the] offense." *Graham v. Florida*, 560 U.S.

48, 59 (2010) (quoting *Weems v. United States,* 217 U.S. 349, 367 (1910)).

Defendant's closing argument does not address the question whether, if sex offender registration is punishment, it is disproportionate or otherwise constitutionally unsound. Defendant asserts only that SORA's registration requirements are not punishment, and therefore do not fall within the Eighth Amendment's proscription against cruel and unusual punishment.

The registration requirements imposed by SORA, coupled with the actual and potential effects of being required to register, are not merely akin to historical punishments, as discussed above. As shown by the evidence in this case, SORA's requirements, as applied to Plaintiffs, subject them to additional punishment beyond their sentences through the pervasive misuse and dissemination of information published by the CBI. Defendant has offered no evidence that any Plaintiff presents an objective threat to society, such as a material risk of recidivism. Yet Plaintiffs have been and continue to be subjected to actual and potential dangers of ostracism and shaming; effective banishment and shunning in the form of limitations on their abilities to live and work without fear of arbitrary and capricious eviction, harassment, job relocation, and/or firing; significant restriction on familial association; and actual and potential physical and mental abuse by members of the public who for whatever reason become aware of their status as a registered sex offender. They are also subject to exposure by local law enforcement agencies making checks of their residences, as happened with Mr. Millard.

All of these are foreseeable consequences of the registry. Indeed, the CBI acknowledges the risk of public harassment and worse by placing a warning on its website that information

obtained there is not to be used for improper purposes.[10] Thus, a convicted offender is knowingly placed in peril of additional punishment, beyond that to which he has been sentenced pursuant to legal proceedings and due process, at the random whim and caprice of unknowable and unpredictable members of the public. This risk continues for the entire time a sex offender is on the registry, and perhaps even beyond that if he is fortunate enough to eventually deregister.

This ongoing imposition of a known and uncontrollable risk of public abuse of information from the sex offender registry, in the absence of any link to an objective risk to the public posed by each individual sex offender, has resulted in and continues to threaten Plaintiffs with punishment disproportionate to the offenses they committed. Where the nature of such punishment is by its nature uncertain and unpredictable, the state cannot assure that it will ever be proportionate to the offense. SORA as applied to these Plaintiffs therefore violates the Eighth Amendment.

SORA as applied to Mr. Vega has resulted in unconstitutional disproportionate punishment for an additional reason. The requirement that Mr. Vega undergo offense specific treatment while in custody was part of the sentence imposed for his juvenile adjudication. As such, it was part of his punishment. The undisputed evidence, at the de-registration hearings in state court and in this Court, is that Mr. Vega completed that treatment as well as serving his entire sentence of confinement and parole. But the magistrates who heard both his petitions to de-register required him to submit evidence other than his uncontradicted testimony that he had

---

[10] The CBI website states: "The use of the sex offender registry information to harass, endanger, intimidate, threaten or in any way seek retribution on an offender through illegal channels is prohibited. Any person who engages or participates in such acts may be charged criminally." CBI website, "Public Notice and User Agreement"; viewable at: https://apps.colorado.gov/apps/dps/sor/search-agreement.jsf (accessed August 30, 2017).

completed treatment, even though the state had destroyed the only records by which Mr. Vega could meet this burden of proof. The state court's refusal to grant de-registration, absent either meeting this impossible burden or completing additional treatment, effectively gave Mr. Vega the choice of an adding additional treatment to his already-completed sentence, or remaining on the sex offender registry indefinitely. Imposing such punitive conditions was disproportionate to Mr. Vega's conviction.

## I. Fourteenth Amendment

### A. Procedural Due Process.

An alleged violation of the procedural due process required by the Fourteenth Amendment prompts a two-step inquiry: (1) whether the plaintiff has shown the deprivation of an interest in "life, liberty, or property" and (2) whether the procedures followed by the government in depriving the plaintiff of that interest comported with "due process of law." *Elliott v. Martinez*, 675 F.3d 1241, 1244 (10th Cir. 2012) (citing *Ingraham v. Wright,* 430 U.S. 651, 673 (1977)).

Mr. Vega has established a procedural due process violation. There is no legitimate dispute that being required to continue sex offender registration indefinitely is a deprivation of Mr. Vega's liberty. The procedures followed by the state in considering his petitions did not comport with basic principles of fundamental fairness—that is, they did not afford him due process.

SORA requires a court weighing a deregistration petition to "consider" whether it is "likely" that the petitioner will re-offend. The reasonable interpretation of this requirement is that the court, to deny a petition, must find that a subsequent sex offense is **likely**. Had the

legislature intended to place the burden on petitioners to prove a subsequent offense is **not** likely, it could easily have said so, but did not.[11] Further, it would make no sense for the statute to require the court to "consider" whether a petitioner is likely to re-offend, but nevertheless leave the court with unbridled discretion to deny a petition without finding that likelihood based on the evidence.

The magistrates hearing both petitions placed the burden on Mr. Vega to prove that another offense was **not** likely. They did so both in general and specifically by requiring him to prove, other than through his own testimony, that he had "successfully" (as defined by the magistrate) completed offense specific treatment. That burden is not consistent with the statute, imposed a vague and subjective standard, and further reversed the long-standing "usual and well known general rule … that the burden of proof lies upon him who substantially asserts the affirmative of an issue." *Gertner v. Limon Nat'l Bank.* 257 P. 247, 253 (Colo. 1927). This reversal of the burden of proof was plainly material, given the second magistrate's observation that it was a close case. *See* Ex. N at 963:17-20 (stating that "this is one of those cases that … I am on the fence on").

The magistrates compounded the unfairness by requiring Mr. Vega to prove this negative fact by providing evidence (beyond his own unrebutted testimony) that he had completed offense specific treatment, even though the state had destroyed the records by which Mr. Vega would have been able to make that proof. And finally, the magistrate in the 2012 hearing actually made

---

[11] Indeed, a recent amendment to § 16-22-113 demonstrates the legislature's ability to impose a burden of proof, in cases involving convictions arising from human trafficking. *See* C.R.S. § 16-22-113(1)(a.5) (effective September 1, 2017) (providing that a court "shall not issue an order discontinuing the petitioner's duty to register unless the petitioner has at least established by a preponderance of the evidence that at the time he or she committed the offense of human trafficking for sexual servitude, he or she had been trafficked by another person….").

proof of completion of treatment a **condition** of granting the petition, a condition that does not appear in the statute and that Mr. Vega could not meet. *See, e.g.,* Ex, M at 909:10-16; Ex. N at 964:1-4.

This Kafka-esque procedure, which was played out not once but twice, deprived Mr. Vega of his liberty without providing procedural due process. The unrefuted evidence was that Mr. Vega had discharged his sentence and had not been convicted of or have pending against him any other relevant pending prosecutions. Defendant in this case has not identified any evidence supporting a conclusion that Mr. Vega was "likely" to commit another sex offense, and neither magistrate made that finding. Other than the magistrates' subjective opinions that Mr. Vega did not appear to have learned sufficiently from his offense specific treatment, there was no evident basis to deny the petition. Accordingly, Mr. Vega was denied his liberty interest in being freed from the burdens of the restrictions imposed on registered sex offenders, even though he complied with all statutory requirements for deregistration. Therefore he was not afforded due process.

Mr. Millard and Mr. Knight have not argued or presented evidence supporting a claim that any procedures followed by the government deprived them of a protected liberty interest without due process of law.

### B.  Substantive Due Process.

The Due Process Clause "guarantees more than fair process." *Seegmiller v. LaVerkin City*, 528 F.3d 762, 766 (10th Cir. 2008) (quoting *Washington v. Glucksberg,* 521 U.S. 702, 719 (1997)).

All of the plaintiffs assert that the restrictions on their liberty imposed on them as

registered sex offenders constitute a violation of the "substantive due process" protection implicit in the Fourteenth Amendment. The Supreme Court has, at times, referred to that concept as constitutional protection against arbitrary governmental actions that are so contrary to the concept of individual autonomy, but has never clearly distinguished between procedural and substantive due process. In *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), the Court distinguished between the abuse of executive power—requiring it to be that which "shocks the conscience"—and other action which is considered to be "fundamentally unfair." The fundamental right to be protected must be "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Seegmiller*, 528 F.3d at 767 (quoting *Chavez v. Martinez*, 538 U.S. 760, 775 (2003)).

In this case, Plaintiffs argue that SORA as applied to them deprives them of rights to privacy and liberty, including privacy expectations in the personal information about them that is made publicly available through SORA, but would not be available (either at all or as readily as is possible under SORA); and liberty interests in living, working, associating with their families and friends, and circulating in society without the burdens imposed by SORA. Mr. Vega extends this argument to the greater expectation of privacy a juvenile offender has in his records. He asserts that even though his juvenile adjudication for the underlying sex offense is not shown on his general criminal history that is publicly available, his adult conviction for failure to register is public, thus making his status as a sex offender public as well and defeating his right to privacy in his juvenile adjudication.

Plaintiffs contend that it is not merely the fact of registration and maintenance of the registry that deprives them of their privacy and liberty, but the widespread dissemination of their

personal information that is permitted and even encouraged through the CBI website and private entities who republish the information, which then has the common and foreseeable adverse consequences of such publication that—as shown by the record in this case and discussed above—are inflicted on registered sex offenders and those with whom they associate.

The cases concerning limitations on punitive damage awards by juries illustrate the difficulty in determining what may be a fundamentally unfair procedure in deprivation of property, violating substantive due process. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), and cases cited therein.[12] But those cases do establish that infliction of punishment cannot be purely arbitrary. The Court recognized that even if procedures used for determining a punitive damages award may be reasonable and subject to judicial review, when an award can be fairly characterized as "grossly excessive" in relation to a state's interests in punishment and deterrence, it may "enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." *Id.*, 517 U.S. at 568. Justice Breyer explained:

> This constitutional concern, itself harkening back to the Magna Carta, arises out of the basic unfairness of depriving citizens of life, liberty, or property, through the application, not of law and legal processes, but of arbitrary coercion…. Requiring the application of law, rather than a decisionmaker's caprice, does more than simply provide citizens notice of what actions may subject them to punishment; it also helps to assure the uniform general treatment of similarly situated persons that is the essence of law itself….

> Legal standards need not be precise in order to satisfy this constitutional concern…. But they must offer some kind of constraint upon a jury or court's discretion, and thus protection against purely arbitrary behavior….

*Id.* at 587-88 (Breyer, J., concurring) (citations omitted).

Here, the plaintiffs have shown that the punitive aspects of Colorado's sex offender registration scheme enter the "zone of arbitrariness" that violates the due process guarantee of

---

[12] This line of cases was not cited in the arguments of counsel.

the Fourteenth Amendment. There is a rational relationship between the registration requirements and the legislative purpose of giving members of the public the opportunity to protect themselves and their children from sex offenses. But what the plaintiffs have shown is that the public has been given, commonly exercises, and has exercised against these plaintiffs the power to inflict punishments beyond those imposed through the courts, and to do so arbitrarily and with no notice, no procedural protections and no limitations or parameters on their actions other than the potential for prosecution if their actions would be a crime.

## Relief

Plaintiffs' Fourth Amended Complaint seeks both declaratory relief and a permanent injunction prohibiting enforcement of SORA against them and dissemination of information regarding their registrations pursuant to SORA. The parties have not addressed the relief sought either at trial or in post-trial submissions.

A party seeking a permanent injunction must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009). The trial court is vested with "necessarily broad" discretion in making this determination.

Plaintiffs have submitted no evidence or argument whatsoever to meet their burden of proof on factors (2) through (4), and Defendant has had no opportunity or reason to submit contrary evidence and arguments. Under these circumstances, permanent injunctive relief has no support in the record and only declaratory relief is appropriate.

## **Order**

Based on the foregoing, it is

ORDERED that judgment shall enter declaring that the Colorado Sex Offender Registration Act, C.R.S. §§ 16-22-101, *et seq.*, as applied to Plaintiffs David Millard, Eugene Knight, and Arturo Vega, violates the Cruel and Unusual Punishment Clause of the Eighth Amendment to the United States Constitution; it is

FURTHER ORDERED that judgment shall enter declaring that the Colorado Sex Offender Registration Act, C.R.S. §§ 16-22-101, *et seq.*, as applied to Plaintiff Arturo Vega, violates procedural due process requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; it is

FURTHER ORDERED that judgment shall enter declaring that the Colorado Sex Offender Registration Act, C.R.S. §§ 16-22-101, *et seq.*, as applied to Plaintiffs David Millard, Eugene Knight, and Arturo Vega, violates substantive due process requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution; and it is

FURTHER ORDERED that Plaintiffs as prevailing parties shall be entitled to an award reasonable attorney's fees as part of the costs, to be determined by the Court pursuant to 42 U.S.C. § 1988(b).

Dated: August 31, 2017

BY THE COURT:

s/Richard P. Matsch

_____

Richard P. Matsch, Senior District Judge